IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                                    Case 2:09-cr-20325-STA-cgc

**ALBERT CHALMERS,**

                **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Albert Chalmers's Motion to Suppress. (Docket Entry "D.E." #36).[1] The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation (D.E. #40). For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**[2]

---

[1] Defendant's Motion to Suppress sought suppression of "any and all statements or admissions alleged to have been made by the Defendant after the incidents in question, which statements were given on or about December 6, 2008." (Mot. to Suppress at 1). However, at the June 23, 2011 hearing on the instant motion, Defendant narrowed the issue to seek to suppress only Defendant's statements made in the squad car regarding his purchase of the firearm and his lack of knowledge that it was reported stolen. (Tr. at 5-6).

[2] Following the hearing on the instant motion, the Court ordered that the parties provide proposed findings of fact and conclusions of law. (Tr. at 95). Both Defendant and the United States filed post-hearing briefs including facts elicited at the hearing and proposed conclusions of law. The United States's post-hearing brief, however, stated that while "[a]ll of the facts below were elicited at the 6/23/11 hearing," "[f]or purposes of efficiency and clarity, not every fact will be cited, but specific quotes will be." (Closing Memorandum Regarding Defendant's Motion to Suppress at 2, n.1.). Despite the United States's perplexing statement, the failure to

1

On December 6, 2008, officers with the Memphis Police Department executed a search warrant at a duplex at 2364 Dexter Avenue in Memphis, Tennessee. (June 23, 2011 Tr. ("Tr.") at 10). During its execution, a firearm and marijuana were recovered, and Defendant and other individuals were arrested. (Tr. at 11, 42). Defendant was advised of his rights at approximately 5:40 p.m., which he acknowledged in writing that he understood. (Tr. at 45; June 23, 2011 Hrg., Exh. 3). Defendant was asked if he wished to answer any questions, to which he clearly and "adamantly" responded that he did not, especially because he had "served time for murder" and "didn't want to talk about the murder." (Tr. at 45-46, 52; June 23, 2011 Hrg., Exh. 3).

Officer Keith Crosby and Officer Jerry Graves transported Defendant to the county jail in an unmarked vehicle with only a "cage wire" separating the front seat from the back seat. (Tr. at 14-15). When they arrived at the jail at 201 Poplar Avenue in downtown Memphis, Officers Graves and Crosby sat in the parking lot with the Defendant to complete certain details of the arrest. (Tr. at 14-17). Officer Graves, who was seated in the front passenger seat, was completing the arrest report and affidavit on a handheld "PDA" device. (Tr. at 15-16). Officer Crosby, who was seated in the driver's seat, proceeded to get the evidence organized, at which time he noticed that the weapon obtained during the execution of the search warrant did not have a tag indicating that it had been checked through NCIC system with respect to whether it was stolen. (Tr. at 17). Officer Crosby asked Officer Graves if it had been checked, and Officer Graves responded that he was not certain. (Tr. at 17, 19).

Because it is required "policy and procedure" to have the gun checked before the evidence

---

provide citation to the factual support did not foster efficiency or clarity. In future filings, parties are expected to provide citations to the record supporting proposed findings of fact.

is processed in the property room, Officer Crosby had to complete this task and the evidence tag before they could proceed. (Tr. at 20, 26). The only manner to check the status of the weapon is to contact "Station B," which is a separate frequency on the police radio. (Tr. at 17, 19, 26).[3] During this process, Officer Crosby would speak into a microphone in his car "like a walkie-talkie," and the information would be relayed back through a "pretty loud" speaker in the radio system that allows "[a]nyone in the car," including Defendant, to hear it. (Tr. at 15, 18, 20). Although the conversation would be audible and was "clear" to understand on that day, the officer and the dispatcher utilize a type of code that would not be understandable to anyone that is not familiar with the terms. (Tr. at 53).[4]

To initiate the check of the weapon, Officer Crosby contacted the Station B dispatcher and

---

[3] Defendant asserted at the hearing on the instant motion that there may be "a question as to whether or not that conversation [between Officer Crosby and Station B] even took place." (Tr. at 98). Defendant's post-hearing brief further questions whether the communication occurred because it is not referenced in either the Record of Arrest or Affidavit of Complaint. (June 23, 2011 Hrg., Exhs. 1, 4). Upon review of the evidence in the record, the two Event Chronologies prepared by Renee LaMondue, Supervisor of the Memphis Policy Department Communications Division, provide no further information, as such reports never contain entries regarding communications with Station B. (Tr. at 76, 85-87; Jun. 23, 2011 Hrg., Exh. 2). Further, although audio recordings are made of communications with Station B, they are only maintained for eighteen months absent a request from either party to preserve them; no such request was made in the instant case. (Tr. at 86-87). Even so, the detailed information provided in the Record of Arrest and the Affidavit of Complaint includes the "NIC" number, the "R/I" number, and the date and location from which the firearm was reported stolen. (June 23, 2011 Hrg. Exh. 1 & 2). This information is exclusively available through Station B and corroborates Officer Crosby's testimony. (Tr. at 93-94). Accordingly, the Court finds that Officer Crosby did contact Station B to inquire as to the status of the firearm.

[4] Defendant's post-hearing brief requests the opportunity to "submit a sample of a Station B recording to show the lack of clarity in the audio quality of those tapes, if permitted by the Court." (Def.'s Corrected Supplemental Memorandum at 7). The Court finds that a "sample" recording is not relevant to the issues presented in the instant motion, and that it is not necessary to the resolution of the question before the Court.

told him that he had a "QG to run," which indicated that he was requesting information regarding a weapon. (Tr. at 52-53). Officer Crosby then provided the serial number, the type, and the model of the weapon. (Tr. at 53). In response to Officer Crosby's information, the Station B dispatcher responded that "it's a W," which indicated that the weapon was stolen. (Tr. at 53). At some point during their conversation, the dispatcher further provided "details about where the gun is stolen from, what day it was stolen . . ., report numbers, [and] things of this nature." (Tr. at 23). The Record of Arrest completed by Officer Graves states that the firearm "came back stolen from Mississippi with a R/I # 070FF003207 and NIC # G961592602" on June 30, 2007. (June 23, 2011 Hrg., Exh. 1). However, what happened between Officer Graves and Defendant during Officer Crosby's conversation with Station B is not entirely clear from the record.[5]

The record reflects that Officer Crosby was busy communicating with Station B at that, during that time, Defendant and Officer Graves had some type of conversation. (Tr. at 22, 52, 56). Officer Crosby recalls that the Defendant "rared up" toward the cage, initiated the conversation with Officer Graves, started "just blurting things out once he heard the lady over the console," and "was asking [Officer] Graves some questions." (Tr. at 22, 54, 63). Specifically, Defendant stated that "he didn't know that gun was stolen" and that "he wouldn't never have bought it had he known that gun was stolen." (Tr. at 21, 52). After Defendant's statement, Officer Crosby recalls that Officer Graves "said something back to him" but he couldn't recall exactly what was said because he was occupied with the Station B dispatch. (Tr. at 22, 52, 56).

---

[5] Officer Graves, who that is alleged to have violated Defendant's Miranda rights by having a conversation with Defendant regarding the status of the firearm, did not testify at the hearing on the instant motion. Neither the United States nor the Defendant sought to call Officer Graves, and the United States advised that Officer Graves was "unavailable on the date of the Suppression Hearing." (Closing Memorandum Regarding Defendant's Motion to Suppress at 1).

4

The Memphis Police Department Record of Arrest, however, contains a narrative of the incident that briefly states as follows: "After Detective Graves told Chalmers the gun was stolen[,] he immediately stated he bought the gun off the street for $20.00." (June 23, 2011 Hrg., Exh 1). The Affidavit of Complaint filed in the Criminal Court of Shelby County, Tennessee, which was affirmed by Officer Graves, provides a similar account: "Detective Crosby ran the handgun on station B and [it] came back stolen in Mississippi with a R/I #070FF03207 and NIC # G961592602 on 06/30/2007. . . . After Detective Graves told Chalmers the gun was stolen[,] he immediately stated he bought the gun off the street for $20.00." (June 23, 2011 Hrg., Exh 4).

**II. Proposed Conclusions of Law**

The sole issue presented in the instant motion is whether Defendant's post-Miranda statement regarding the firearm should be suppressed. Specifically, Defendant asserts that after he invoked his Miranda rights orally and in writing, he was subjected to custodial interrogation or its functional equivalent and that it was in response to this interrogation that he made a statement regarding his possession of the firearm. The United States does not contest either that Defendant had previously asserted his Miranda rights or that Defendant was in custody when he made a statement; however, the United States argues that Defendant voluntarily made a statement absent any interrogation or its functional equivalent.

The Supreme Court set forth in Miranda v. Arizona, 384 U.S. at 436 (1996), the procedural safeguards that must be employed by law enforcement officers to secure the privilege against self-incrimination and the right to counsel Id. at 444. Before a person may be subjected to custodial interrogation, he must be apprised "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney,

5

either retained or appointed." Id. Interrogation for purposes of Miranda is defined as "questioning initiated by law enforcement officers," id., or the "functional equivalent" of express questioning, which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," Tolliver v. Sheets, 594 F.3d 900, 917 (quoting Rhode Island v. Innis, 446 U.S 291, 300-01 (1980); Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990)). The movant must demonstrate by a preponderance of the evidence that he was subjected to custodial interrogation before Miranda's protections apply. United States v. Lawrence, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 882135, 1989 WL 153161, at *8 (6th Cir. 1989), cert. denied, 494 U.S. 1019 (1990); see also United States v. Aguando-Garcia, No. 3:09cr175, 2010 WL 3769107, at *9 (S.D.Ohio Sept. 27, 2010).

In the instant case, while the parties do not contest that Defendant was in custody at the time he made the statements regarding the firearm, the essential question is whether Defendant has met his burden of demonstrating that he was subjected to interrogation. Because neither Defendant nor Officer Graves testified at the hearing on the instant motion, the Court has a limited picture as to what transpired. The evidence reflects that Officer Crosby was occupied in communicating with Station B, and that Defendant would have been able to hear certain coded information of their conversation—namely, that Officer Crosby was requesting a "QG," the serial number, the type, and the model of the weapon, that the response was "W," a "NIC" number, a "R/I" number, a date of June 30, 2007, and the location of Mississippi.

Simultaneously, a conversation transpired between Officer Graves and Defendant, and while the Court has no means of pinpointing the sequence of which statements were made in relation to

6

the information being broadcast over the radio by Station B or even the sequence of the conversation between Officer Graves and Defendant, the record does provide certain unrefuted details. First, Defendant initiated the conversation with Officer Graves and began "blurting things out." Second, Officer Graves informed Defendant at some point during their conversation that the firearm was stolen. Third, Defendant stated that "he didn't know that gun was stolen," that he "bought the gun off the street for $20.00," and that "he wouldn't never have bought it had he known that gun was stolen."

The Court cannot glean from these pieces of evidence regarding two simultaneous yet related conversations a perfect picture of what occurred. However, certain conclusions from the evidence are inevitable and are sufficient to resolve the instant motion. Initially, there is no evidence whatsoever that Officer Graves and Officer Crosby—or any other law enforcement officer for that matter—initiated any express questioning of Defendant during this isolated interaction. With respect to whether Defendant was subjected to the functional equivalent of interrogation, the record does not reflect that Officers Graves and Crosby engaged in conduct that they should have known was reasonably likely to elicit and incriminating response.[6]

As to Officer Crosby, he conducted his entire communication with Station B in code, which is precisely orchestrated to prevent a suspect from understanding the information. Further, Officer Crosby's conversation with Station B is the type of investigatory work or "policy and procedure,"

---

[6] Although the standard for assessing the functional equivalent of interrogation is an objective one, it is worth noting that Officer Crosby testified that he did not have the subjective intent of attempting to elicit an incriminating response from the suspect and that his actions were not "some time tested investigation in order to get [Defendant] to start talking." (Tr. at 63-64). Without Officer Graves testimony, there is no indication of his subjective intent; however, such information is not necessary to resolve the issue.

(Tr. at 20, 26), that is "normally attendant to arrest and custody" and does not constitute interrogation. See Tolliver, 594 F.3d at 917. This remains true even if Defendant were able to have recognized any of the details in the conversation or guessed that they were running such a search of the weapon.

As to Officer Graves, the record reflects that he informed Defendant at some point during their conversation that the firearm was stolen. Although Defendant would argue that this is precisely the type of provocative conversation within his earshot that would constitute the functional equivalent of interrogation, the unrefuted evidence before the Court remains that Defendant himself initiated the conversation. Ultimately, even though Officer Graves provided information regarding the status of the weapon, and even though certain other coded information of Officer Crosby's communication was audible in the car, these facts do not take Defendant's voluntary communication and render it to be the product of official interrogation. Thus, the Court concludes that the evidence is not sufficient to demonstrate that Defendant was subjected to the functional equivalent of interrogation.

Because Defendant has not met his burden of demonstrating that he was subjected to custodial interrogation or its functional equivalent, Miranda has not been violated. Further, by mere happenstance, officers had sought to interview Defendant earlier in the evening and had provided him his Miranda rights at that time. Thus, Defendant had actually been provided an additional benefit in the form of advice of rights which, based upon the isolated interaction at issue in the instant motion alone, would have not been required by law. It is in this context that Defendant elected to make a statement regarding his purchase of the firearm. When such an inculpatory statement is made voluntarily while in custody but not in response to official interrogation, no

grounds exist pursuant to Miranda for the statement to be suppressed.

### III. Conclusion

For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**DATED** this 16th day of September, 2011.

        s/ Charmiane G. Claxton
        CHARMIANE G. CLAXTON
        UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**